**EXTRACO MORTGAGE f/k/a First Bankers Mortgage Co., Appellee,**

v.

**Kent B. WILLIAMS, II, Appellee.**

**Fulton Bank, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 15, 2002.

Filed July 29, 2002.

---

John N. Elliot, Lancaster, for appellant.

Michelle M. Bradford, Philadelphia, for appellees.

Before: STEVENS, TODD, and CAVANAUGH, JJ.

TODD, J.

¶ 1 Fulton Bank ("Fulton") appeals the trial court's order denying its exceptions to a sheriff's schedule of proposed distributions following a foreclosure sale. We affirm.

¶ 2 Extraco Mortgage f/k/a First Bankers Mortgage Co. ("Extraco") brought a mortgage foreclosure action in December 1999 against property formerly owned by Kent B. Williams in Columbia, Pennsylvania. The complaint claimed that approximately $61,000 was due. On this same property, Fulton had a junior lien on which approximately $55,000 was due.

¶ 3 Shortly after filing its action, and prior to obtaining judgment, Extraco paid approximately $30,000 in back taxes and hazard insurance premiums on the property to forestall a scheduled judicial sale, but made no attempt to amend its complaint in the foreclosure action to include these additional damages. In May 2000, Extraco obtained a default judgment for $63,374.14, filed for a writ of execution for that amount plus interest, and requested a sheriff's sale. The property was sold at a sheriff's sale for $100,500. Following the sale, the sheriff filed a schedule of proposed distributions listing as payable to Extraco $91,446.66, which amount included Extraco's judgment plus, at Extraco's request, the back taxes and hazard insurance premiums it had paid on the property. Under this schedule, only $652.54 remained to be distributed to Fulton.

¶ 4 Fulton filed exceptions to the proposed distribution, arguing that Extraco's recovery should be limited to the amount of its judgment, and not include the taxes and insurance premiums which it failed to incorporate in its foreclosure action. Under this argument, Fulton would get a significantly larger distribution. Following a hearing on March 27, 2001, the trial court denied these exceptions and this timely appeal followed.

¶ 5 On appeal, Fulton asks:

1. Has Extraco waived any entitlement to recover from the proceeds of the Sheriff's Sale any amounts for voluntary advances in connection with the mortgage by not seeking such amounts in its mortgage foreclosure action?

2. Even if Extraco could recover its voluntary advances from the proceeds of the Sheriff's Sale, are such voluntary advances subordinate in lien to the interest of Fulton Bank?

(Brief for Appellant, at 1–2.)

¶ 6 Initially, we note:

Where exceptions to the distribution of the proceeds of a foreclosure sale are filed, a court will hear and determine them according to law and equity. The priority of liens as they appear on record is prima facie evidence of the manner in which the proceeds are to be distributed. However, if the exceptant can produce evidence that he is equitably entitled to priority, the order of payment of the proceeds of a foreclosure sale will be changed.

*Farmers Trust Co. v. Bomberger*, 362 Pa.Super. 92, 96, 523 A.2d 790, 792 (1987) (citations omitted). Our standard of review with respect to the action of a chancellor in equity is limited. *Thermo–Guard, Inc. v. Cochran,* 408 Pa.Super. 54, 63, 596 A.2d 188, 193 (1991). We will reverse only where the trial court was "palpably erroneous, misapplied the law or committed a manifest abuse of discretion." *Id.* Where there are any apparently reasonable grounds for the trial court's decision, we must affirm it. *Id.*

¶ 7 Fulton first argues that Extraco waived any entitlement to recover amounts in excess of its judgment (i.e., the taxes and hazard insurance premiums) by failing to request them in its mortgage foreclosure action against Williams. Fulton does not allege that the proposed distribution was in any sense inaccurate, but instead argues that, as Extraco did not amend its complaint to assert these additional damages, it was prohibited from recovering them at the sheriff's sale. We disagree and conclude that the sheriff's distribution was justifiable and equitable under the circumstances.

¶ 8 The trial court concluded, and we agree, that Fulton produced no evidence or argument that it had been harmed by Extraco's failure to amend its complaint to include the costs it advanced. (Trial Court Opinion, 6/13/01, at 3–4.) Rather, it is clear to this Court that the payment of the property taxes by Extraco inured *to the benefit* of Fulton, as had the property been sold at the scheduled judicial sale, Fulton's lien could have been extinguished.[1] *See* 72 P.S. §§ 5860.610, 5860.612. Indeed, in its arguments to this Court, Fulton offers no scenario under which its lien would have been preserved without the tax obligation having been first satisfied. Rather, it asserts only a procedural argument, without any citation to

---

1. The payment of the hazard insurance premiums also arguably protected Fulton's interest in the property.

caselaw in support thereof, that Extraco should not be allowed to collect on these payments because it failed to amend its complaint accordingly. We will not sanction the windfall that would result to Fulton were we to accept its argument.

¶ 9 Further, Fulton nebulously claims that if Extraco's approach is sanctioned, it will "damage the integrity of the bidding process" as bidders will not know of "hidden liens" (e.g., the property taxes paid by Extraco for which it later sought remuneration) not on the public record.[2] (Brief for Appellant, at 6.) However, Fulton concedes that it did not bid at the sheriff's sale. (N.T. Hearing, 3/27/01, at 31.) Extraco argues persuasively that, as a result, Fulton could have had little or no expectation of getting any recovery from the sale, as property so sold often sells for amounts just sufficient to protect bidding lien holders; thus Fulton's inaction assured its interest would not be protected. (Brief for Appellee, at 17–19.) While Fulton claims that permitting Extraco's approach would "clearly prejudice creditors and other parties with interests in property" (Brief for Appellant, at 6), it fails to explain how this is the case. This Court cannot conceive of any scenario under which Fulton would have received more money, regardless of whether Extraco amended its complaint or not, or whether the taxes had been paid before the sale or after.[3]

¶ 10 Most importantly, the Rules of Civil Procedure provide for an exceptions process, which Fulton utilized herein, requiring a court to review a challenge to a sheriff's proposed distributions. *See* Pa. R.C.P. 3136. By this process, Extraco was obliged to justify the legitimacy of its claimed distributions. Fulton's rights thusly were safeguarded.

2. Regarding the "hidden" nature of the liens, in this case, of Extraco's claim for taxes, we note that Fulton was well aware of Extraco's claim for property taxes. Around the time the mortgage action was being prepared by Extraco, it discovered the back taxes owing on the property and the Fulton lien, and had discussions with Williams and Fulton about refinancing the loan and paying off Extraco's first mortgage and outstanding taxes. (N.T. Hearing, 3/27/01, at 22–23.) Fulton informed Extraco that it was not interested in refinancing Williams' loan, but was aware of Extraco's intention to pay the back taxes. (*Id.* at 23, 30.) Consequently, the record is clear that Fulton was fully informed about the outstanding taxes and Extraco's intention to pay them to prevent a judicial sale.

3. For example, assume a property on which a first lien holder is owed $10,000, a second lien holder is owed $5,000, and property taxes of $2,000 remain unpaid. Also assume that at a sheriff's sale of the property each lien holder's bid is sufficient to protect its investment in the property (i.e., if no taxes were owed, the first lien holder would bid $10,000 and the second lien holder would bid $15,000), and that the property sells for that amount. Now, if the first lien holder behaved as Extraco did in this case, by paying the taxes before the sale, but planning to recoup them from the distribution, it would bid $12,000. The second lien holder, observing that no taxes were owed (and unaware that the first lien holder would later request to recoup the taxes), would bid $15,000. Following the sale, the second lien holder would recoup $3,000 on its lien (with $10,000 paying off the first lien and $2,000 distributed to the first lien holder for the taxes it had paid before the sale), and thus would have paid $12,000.

Alternatively, if the first lien holder did not pay the taxes ahead of the sale, it would still bid $12,000, to account for its lien and the back taxes that would be distributed to the taxing authorities. The second lien holder would bid $17,000, to account for the first and second liens and the back taxes. Following the sale, the second lien holder would recoup $5,000 on its lien (with $10,000 paying off the first lien and $2,000 distributed to the taxing authorities), and thus would, again, have paid $12,000. Accordingly, whether the taxes are paid before the sheriff's sale or out of the proceeds of it, the second lien holder will need to pay the same amount of money to protect its investment.

¶ 11 As an alternative argument, Fulton likens Extraco's payment of the back taxes and hazard insurance premiums to advances under an advance money mortgage, and asserts that, even if Extraco were entitled to be compensated for these payments, because the payments were not obligatory under the terms of Extraco's mortgage with Williams, and because the payments occurred after Fulton's lien, they are subordinate to Fulton's lien. We agree with Fulton's statement of the law: only obligatory advances under an advance money mortgage relate back to the date of the mortgage such that they take precedence over subsequent liens. *See Central Pa. Sav. Ass'n v. Carpenters of Pa., Inc.*, 502 Pa. 17, 22, 463 A.2d 414, 417 (1983). Fulton's argument fails, however, because Extraco's mortgage was not an advance money mortgage and the "advances" were payments made to avoid a judicial tax sale.

¶ 12 Further, for the reasons we already have articulated in response to Fulton's first argument, we cannot abide by Fulton's attempt to place the tax burden onto Extraco, without chance of recovery, where Fulton has failed to indicate how it may have protected its interest in the Williams' property, or recovered any money from it, without first ensuring that the taxes were paid.[4] Finally, we agree with the trial court that "a dangerous precedent would be set if this Court held that a first mortgagee could not make advances in order to preserve the property or to protect its investment against divestiture through a judicial tax sale." (Trial Court Opinion, 6/13/01, at 4.)

¶ 13 As we find that the trial court properly dismissed Fulton's exceptions to the sheriff's schedule of proposed distributions, we affirm its order.

¶ 14 Order affirmed.

---

4. An arguable exception to this analysis was Extraco's payment of hazard insurance premiums on the property, because the failure to pay these premiums would not have triggered a judicial sale, and they do not have priority over other liens. However, the arguments Fulton advances in this appeal do not distinguish between the tax payments and the insurance premiums; therefore, we conclude Fulton has waived a claim to recover the insurance premium payments as distinct from the tax payments. Further, as we have already noted, payment of the hazard insurance premiums, nevertheless, did protect Fulton's interest in the property.